**UNITED STATES of America**

v.

**Lee Thomas RICHARDSON, Defendant.**

**Crim. No. 88–063–LFO.**

United States District Court,
District of Columbia.

Aug. 9, 1988.

Jay B. Stephens, U.S. Atty., John P. Dominguez, Mary Incontro, Asst. U.S. Attys., Washington, D.C., for U.S.

Christopher G. Hoge, Crowley, Hoge & Fein, P.C., Washington, D.C., for defendant.

## MEMORANDUM AND ORDER

OBERDORFER, District Judge.

An indictment dated April 5, 1988 charges defendant, a former employee of the Dunbar Federal Armored Express Company, with embezzlement of $5,000 cash, which disappeared from an armored car driven by defendant on December 19, 1986. Several months after the disappearance, FBI agents asked defendant to come to their Washington Field Office for an interview. During that interview, defendant denied responsibility for, or any knowledge of, the crime. He incidentally told the agents about a defect on the seal on one of the money bags and said that he had pointed out the defect to his co-worker aboard the truck. In the course of the interview, defendant agreed to return to the FBI office for a polygraph examination.

A few weeks later, in response to another request from the agents, defendant came back to the FBI office for an interview. The agent in charge of the case, Philip J. Rendin, introduced the defendant to the polygraph technician. The technician then administered the test, which measured certain physical reactions of defendant while responding to a series of questions. At the conclusion of the test, the technician advised defendant that he had "failed" one question: "Did you steal any of that money?" Thereafter, according to defendant, the technician spoke generally about the admissibility in evidence of polygraph examination results, indicating in a general way that in some unidentified jurisdictions they were (or might be) admissible. The technician did not identify the admissibility of polygraphs in this or any other specific jurisdiction. Defendant also testified that the technician said that the machine does not lie and encouraged defendant to go on and admit that he had taken the money. Defendant continued to deny taking the money.

At the conclusion of the examination, Agent Rendin and his partner, John S. Kerr, spoke with defendant in a variation of the "bad guy/good guy" routine. According to defendant, Agent Rendin, the "bad guy," scolded defendant in an "angry," "loud" way for not admitting that he took the money. According to defendant, Rendin threatened a la *Jean Val Jean* to follow defendant for the rest of his life because the agent knew he would "get"

defendant sooner or later. The conversation also alluded to the possibility that if defendant confessed and made restitution he might get probation. This interview made defendant "nervous." According to defendant, however, Agent Rendin never made any promises of leniency, never used physical force, and never made any specific threats other than his threat to "follow" defendant until he "got" him.

A couple of minutes later, according to defendant's account, a "soft spoken" agent came in to talk to him. Like defendant, the "good guy," Agent Kerr was an ex-Marine, and they talked about that coincidence. Kerr suggested that the first agent was "hot headed," and told defendant, "Don't let him get you. You just need to tell us what he wants to hear." In response to defendant's inquiry about what would happen if he admitted responsibility, there was further discussion of probation if he confessed and made restitution. However, defendant admits that no promises of leniency were made. After a few minutes of this conversation, defendant admitted that he had taken the $5,000 because, he testified, he was afraid of what would happen to him if he didn't give a statement.

The testimony is clear that defendant had come to the FBI office without any coercion, was not in custody there, and was not handcuffed or otherwise restrained. Defendant testified that he understood that he did not have to come to the FBI office and that he did so, and remained there, freely. There was no crowd of agents, brandishing of weapons, or threat of any force. While there were intimations of probation if there were a confession and restitution, there was no promise. Also, even though one agent was aggressive and angry, stated his belief that defendant was guilty and that he would prove it sooner or later, there were no threats of enhanced charges or penalties. Although defendant was at the FBI office for several hours, there is no suggestion that he could not have left at any time or that his will was weakened by long, intensive questioning or harassment. Nor is there any suggestion that the polygraph operator manipulated the test or misrepresented the result.

Defendant urges that the combination of a polygraph examination, suggestions that its adverse result might be admissible, conversation (without promise) about dogged pursuit of defendant if he did not confess and about restitution and probation if he did, was police misconduct which extracted the confession involuntarily.[1]

The Supreme Court has recently catalogued the kinds of police interrogation which are sufficiently coercive to preclude admission of any confession extracted during the interrogation. *See Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 520 n. 1, 93 L.Ed.2d 473 (1986). The agents' conduct here does not meet that description. Moreover, *Connelly* reiterated the Court's earlier caution against expanding " 'currently applicable exclusionary rules by erecting additional barriers to placing truthful and probative evidence before … juries.' " *Id.* 107 S.Ct. at 521–22 (quoting *Lego v. Twomey*, 404 U.S. 477, 488–89, 92 S.Ct. 619, 626–27, 30 L.Ed.2d 618 (1972)).

The defendant's theory is interesting. But he has produced, and the Court has discovered, no authority which sustains his contention. On the contrary, the recent emanations from the Supreme Court discourage any extension of the present pattern of decisions suppressing confessions obtained in noncustodial circumstances such as proven here. Accordingly, it this 9th day of August, 1988, hereby

ORDERED: that defendant's motion to suppress should be, and is hereby, DENIED.

---

**1.** Defendant makes no issue of the adequacy of any *Miranda* warning or the voluntariness of any resulting waivers.